UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NUMA HERNANDEZ,                          :

                     Petitioner,        :        **<u>MEMORANDUM DECISION</u>**

           - v -                          :        15-cv-235 (DC)

WILLIAM LEE,                             :

                   Respondent.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

APPEARANCES:         NUMA HERNANDEZ
                     Petitioner *Pro Se*
                     1924 Bedford Avenue
                     North Bellmore, NY 11710

                     MELINDA KATZ, Esq.
                     District Attorney
                     Queens County
                     By:    Edward D. Saslaw, Esq.
                            Assistant District Attorney
                     125-01 Queens Boulevard
                     Kew Gardens, NY 11415
                            Attorney for Respondent

CHIN, Circuit Judge:

        On September 15, 2009, following a jury trial, Numa Hernandez was

convicted in the Supreme Court of the State of New York, Queens County (McGann, *J.*),

of second-degree attempted murder and second-degree criminal possession of a

weapon.  Hernandez was sentenced to concurrent determinate prison terms of ten years

and five years' post-release supervision.  *See* Dkt. 8 at 13; Dkt. 9-2 at 478.  The

convictions were affirmed by the Appellate Division, Second Department, *People v.

Hernandez*, 938 N.Y.S.2d 605 (2d Dep't 2012) ("*Hernandez I*"), and the New York Court of

Appeals denied leave to appeal, *People v. Hernandez*, 973 N.E.2d 211 (N.Y. 2012)

(Ciparick, J.) ("*Hernandez II*").

On January 13, 2015, Hernandez petitioned this Court for a writ of habeas

corpus pursuant to 28 U.S.C. § 2254 (the "Petition").  *See* Dkt. 1.  Respondent William

Lee, the superintendent of the Eastern Correctional Facility, represented by the Queens

County District Attorney's Office, opposed the Petition on July 31, 2015, and Hernandez

filed his reply on October 5, 2015.  *See* Dkt. 8, 13.  The case was thus fully briefed in

October 2015.  Starting in 2018, Hernandez filed three letters requesting an update from

the Court on the status of the Petition.  *See* Dkt. 15, 16, 17.  In a minute order entered

August 5, 2019, the Court responded by advising that the Petition "remains under

consideration."  Docket at 4.

Hernandez was released on March 20, 2018, and his period of supervised

released is scheduled to end on March 20, 2023.[1]

---

[1]      According to the New York State Department of Corrections Incarcerated Lookup function and
Hernandez' DIN #09A6313, Hernandez was released on March 20, 2018.  His Post Release Supervision
Maximum Expiration Date is March 20, 2023.  *Incarcerated Lookup*, DEP'T OF CORR. AND CMTY. SUPERVISION,
https://nysdoccslookup.doccs.ny.gov/ (last visited Feb. 28, 2023).

On January 17, 2023, the case was reassigned to the undersigned.  For the reasons set forth below, the Petition is denied.

## BACKGROUND

### I.    Facts

The evidence at trial established the following:

On January 3, 2006, at about 1:50 p.m., Robert Iccori called Hernandez -- his "weed dealer" -- from his second-floor apartment in Queens to place a $50 order for marijuana.  *See* Dkt. 8 at 5; Dkt. 9-2 at 38-39, 50.  Hernandez came to the house and delivered the marijuana to Iccori in the first-floor vestibule and then left.  Iccori determined, however, that the amount of marijuana was "short" and called Hernandez and demanded that he return.  *See* Dkt. 9-2 at 45.  Hernandez did so.  Iccori went downstairs to get Hernandez and the two then went up to Iccori's apartment.  There, the two men engaged in a brief verbal and physical altercation.  *Id.* at 45-48, 107-09, 111-14.  Iccori then apologized, Hernandez left the apartment, and Iccori telephoned him shortly thereafter to apologize again.  *Id.* at 48, 114.

Ten minutes later, Hernandez returned with a friend.  *Id.* at 48-49.  The doorbell rang and Iccori went downstairs to answer the door.  He opened an inner door, entered the vestibule, and saw the friend through the windows of the front door.  Iccori opened the door and the friend entered the vestibule.  Iccori backed up through the inner door into the hallway of the house.  The friend threw a punch, and Iccori

slammed the inner door on the friend's fist; the glass pane in the door shattered. *Id*. at 51, 86-91, 93-94. Hernandez then entered, pointed a gun at Iccori from close range, and fired about four shots. Iccori was hit twice, once in the chest and once in the arm. *Id*. at 38, 54, 94-96. Iccori ran further inside the hallway, and after Hernandez and his friend fled, Iccori ran upstairs to his apartment and called 911 to report that he had been shot. He then went back downstairs to wait for an ambulance. *Id*. at 56-58, 100-04.

Soon thereafter, police officers Jerome Keeley and Myrna Ramirez arrived at Iccori's house and found Iccori on the front porch. *Id*. at 177-78. Officer Keeley observed a hole in Iccori's shirt with blood in the chest area and also on his arm; he determined that Iccori had been shot twice. *Id*. at 179-80, 194. As Officer Keeley entered the premises, he observed "[g]lass all over the floor and several empty bullet casings." *Id*. at 184. Police detective Michael Sinatra and his partner arrived shortly thereafter and searched the premises. They found three discharged shell casings in the vestibule and hallway. They also found a spent bullet in a hallway near the steps and bullet holes in the door of the downstairs apartment as well as in the shower of the first floor bathroom. *Id*. at 137-146. The shell casings led Detective Sinatra to believe that a semi-automatic weapon using .380 ammunition was fired three times. *Id*. at 147; Dkt. 8 at 8. No ballistic evidence was found in the downstairs apartment or on the steps leading up to the upstairs apartment. *Id*. at 161; Dkt. 8 at 8.

In the meantime, the officers obtained a search warrant and proceeded to search the second floor apartment, uncovering a BB gun, an unloaded shotgun, a clear plastic bag of marijuana, two smoking pipes, and $1,180 cash. *See* Dkt. 9-2 at 193; Dkt. 8 at 8-9. Iccori was taken away in an ambulance and hospitalized for several days to treat his injuries. *See* Dkt. 8 at 9.

## II.        Procedural History

### a.        *State Supreme Court Proceedings*

On September 14, 2006, Hernandez was charged with one count each of second-degree attempted murder, first-degree assault, second-degree criminal possession of a weapon, second-degree assault, and third-degree criminal possession of a weapon, N.Y. C.P.L. §§ 110.00/125.25[I], § 120.10[I], § 265.03[2], § 120.05[2]. § 265.02[4] (Queens Co. Indictment No. 2315/2006). *See* Dkt. 8 at 9-10; Dkt. 9-1 at 151. Hernandez surrendered to the police on March 21, 2006, and was released on bail. *See* Dkt. 9-2 at 250, 304; Dkt. 9 at 9-10.

Trial commenced on September 3, 2009. Iccori testified that he called Hernandez to his apartment to buy $50 dollars' worth of marijuana and argued with him when he found the amount of marijuana to be insufficient. *See* Dkt. 9-2 at 45-46. They wrestled and Hernandez left, at which point Iccori called him to apologize. *Id*. at 45. Hernandez then returned to the apartment with a friend and shot Iccori approximately four times, hitting him in the arm and the chest. *Id*. at 53-4. The

5

prosecution played a recording of Iccori's 911 call at trial, as well as a 911 call made by a neighbor. *Id*. at 58, 238.

Detective Sinatra also testified about his search of the premises, the evidence collected, and photographs taken at the scene. *Id*. at 137-144. Officer Keeley testified about his observation of the premises upon arriving, the search of the apartment pursuant to the warrant, and the evidence found at the apartment. *Id*. at 175-84, 186-92. Neither party presented expert testimony.

Hernandez took the stand in his own defense and gave a conflicting account of what transpired on January 3, 2006. *See* Dkt. 9-2 at 243-313, 38-130. Hernandez testified that he went to Iccori's apartment alone to buy $50 dollars' worth of marijuana. *See id*. at 252. After Hernandez complained that the bag of marijuana was "half full," he demanded that Iccori give him a different one. *Id*. After Iccori refused, Hernandez threw the bag in his face. *Id*. at 253. Iccori punched Hernandez and chased him down the stairs, slamming one of the front doors and causing the glass to shatter. *Id*. at 252-54. Hernandez then saw that Iccori held a gun and struggled with him to point the barrel away from him, at which point the gun went off several times. *Id*. at 256. Hernandez testified that he watched the gun fall to the ground and did not see Iccori get shot. *Id*. at 256, 261, 298. He then fled the scene. *Id*. at 258. Though he was

aware the police were looking for him, he did not turn himself in for two months and grew a beard.  *Id*. at 250, 266.

After the witnesses testified, a juror informed the court that his brother-in-law belonged to an organization of which Hernandez was also a member, which Hernandez had disclosed when he testified.  *Id*. at 341-43.  In light of this connection, the juror said his continuing service on the jury would make him "uncomfortable" but that it would not "prevent [him] from being a fair and impartial juror."  *Id*. at 349.  When asked by the court for clarification, the juror said that he had not discussed the case or the organizational affiliation with his brother-in-law and that this knowledge would not make it difficult for him to decide on a verdict.  *Id*. at 350.  After discussing the issue in a sidebar with counsel, the court dismissed the juror and seated an alternate.  *Id*. at 355.

The jury returned a verdict convicting Hernandez of second-degree attempted murder and second-degree criminal possession of a firearm.[2]  *Id.* at 456-7.  Hernandez was sentenced to concurrent determinate prison terms of ten years as well as five years' post-release supervision.  *See id.* at 478; Dkt. 8 at 10.

---

[2]       The jury was instructed to consider the first-degree and second-degree assault charges only if it found Hernandez not guilty of second-degree attempted murder, and to consider the third-degree possession charge only if it found Hernandez not guilty of second-degree criminal possession of a weapon.  Dkt. 9-2 at 432-34, 438.

b.   *Post-Conviction Proceedings*

On August 11, 2011, Hernandez, represented by counsel, appealed to the Appellate Division, Second Department.  He raised five claims:  (1) the trial court abused its discretion in dismissing the juror, (2) the 911 call was erroneously admitted under the present sense impression hearsay exception, (3) trial counsel provided ineffective assistance by failing to request a jury instruction on justification , (4) the delay between the indictment and trial violated his speedy trial rights, and (5) certain remarks made by the prosecution during cross-examination and summation violated his right to a fair trial.  *See* Dkt. 9 at 13.

On February 14, 2012, the Appellate Division affirmed Hernandez's convictions.  *Hernandez I*, 938 N.Y.S.2d at 606-07.  The Appellate Division held that the trial judge did not abuse its discretion in dismissing the juror because "he could not unequivocally state that he could reach a fair and impartial decision."  *Id*. at 607.  The Appellate Division rejected Hernandez's hearsay objection because it held that the 911 call fell within the present sense impression exception.  *See id*.  As to the ineffective assistance of counsel claim, the court held that Hernandez was not deprived of effective assistance of counsel under either the federal or the state standard.  *See id*.  (collecting federal and state cases).  The Appellate Division rejected Hernandez's speedy trial claim because it found that "[t]he total time chargeable to the People was less than the six-month time period" permitted under New York law.  *Id*. at 606.  Finally, the court held

8

that Hernandez's claim that he was deprived of a right to a fair trial was unpreserved and, in any event, that the "challenged remarks were fair comment on the evidence, permissible rhetorical comment, or responsive to defense counsel's summation, or do not warrant reversal." *Id*. at 607. (collecting state cases). On July 29, 2012, the New York Court of Appeals denied leave to appeal. *Hernandez II*, 973 N.E.2d at 211.

On July 19, 2012, Hernandez moved *pro se* to vacate the judgment pursuant to C.P.L. § 440.10. *See* Dkt. 9-1 at 5-35. The People opposed, *see id*. at 201-10, and the trial court denied the motion on February 4, 2013. *See id*. at 140-42. In its decision, the court listed the incorrect indictment number and erroneously described Hernandez as having killed Iccori. *Id*. at 140. Hernandez subsequently filed motions for leave to appeal the denial of the § 440.10 motion and for reconsideration, both of which were denied. *See* Dkt. 9-1 at 224-35, 139, 128-37; Dkt. 8 at 15. The Appellate Division, Second Department also used the incorrect indictment number in its denial of leave to appeal. *See* Dkt. 9-1 at 139.

c.    *Proceedings Below*

Hernandez filed this habeas petition on January 13, 2015. *See* Dkt. 1. In addition to raising certain of the claims raised before the Appellate Division, Hernandez also seeks relief on the grounds that the state courts' use of the incorrect indictment number and factual description of the crime violated his due process rights. *See id*. at 8-11.

9

*DISCUSSION*

I.        **Federal Review of State Convictions**

A federal court may not grant a habeas petition on a claim that was

adjudicated on the merits in state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law,
> as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented
> in the State court proceeding.

28 U.S.C. § 2254(d); *see Waiters v. Lee*, 857 F.3d 466, 477 (2d Cir. 2017); *Harrington v.*

*Richter*, 562 U.S. 86, 97-98 (2011).  Hence, when a claim is adjudicated on the merits, the

state court's decision must be accorded "substantial deference."  *Fischer v. Smith*, 780

F.3d 556, 560 (2d Cir. 2015).  "A federal court may reverse a state court ruling only

where it was 'so lacking in justification that there was . . . [no] possibility for fairminded

disagreement.'"  *Vega v. Walsh*, 669 F.3d 123, 126 (2d Cir. 2012) (per curiam) (quoting

*Harrington*, 562 U.S. at 103); *see also Wetzel v. Lambert*, 565 U.S. 520, 524 (2012).

Generally, "federal courts will not review questions of federal law

presented in a habeas petition when the state court's decision rests upon a state-law

ground that is independent of the federal question and adequate to support the

judgment."  *Cone v. Bell*, 556 U.S. 449, 465 (2009) (citation omitted).  That is, federal

courts may not review a state court ruling that "fairly appear[s] to rest primarily on

state procedural law," so long as the procedural bar is "adequate to support the judgment." *Murden v. Artuz*, 497 F.3d 178, 191-92 (2d Cir. 2007) (citations omitted).  The Second Circuit has "held repeatedly that the contemporaneous objection rule" -- barring state appellate courts from reviewing arguments presented for the first time on appeal pursuant to N.Y. Crim. Proc. Law § 470.05(2) -- "is a firmly established and regularly followed New York procedural rule." *Downs v. Lape*, 657 F.3d 97, 103, 104 (2d Cir. 2011) (citations omitted).

## II.   Analysis

Hernandez raises eight claims in the Petition:  (1) his trial counsel was ineffective in responding to alleged prosecutorial misconduct, (2) the § 440 court's errors in denying his motion to vacate (using an incorrect indictment number and referring to Hernandez having killed Iccori) deprived him of due process, (3) the Appellate Division's inclusion of the incorrect indictment number in denying leave to appeal the denial of his motion to vacate deprived him of due process, (4) the trial court's decision to admit the 911 call violated his Sixth Amendment right to confrontation, (5) his trial counsel's failure to request a jury instruction on justification defense constituted ineffective assistance, (6) the prosecution engaged in misconduct during cross-examination and summation with respect to his being fired from an internship, (7) his trial counsel provided ineffective assistance in his handling of the internship issue, and (8) the trial court's decision to dismiss a juror violated his right to a fair trial.  *See* Dkt. 1.

First, I discuss the three ineffective assistance claims (one, five, and seven) together with the sixth claim, which is related to the seventh claim. Second, I consider the two claims arising from the errors in the decisions in the § 440 proceedings (claims two and three). Third, I address the fourth claim based on the trial court's admission of the 911 recording. Finally, I consider the eighth claim based on the trial court's discharge of the juror.

### A.    Ineffective Assistance of Counsel and Prosecutorial Misconduct

Hernandez contends that his counsel provided ineffective assistance because counsel was ineffective in objecting to the "prosecutor's rampant misconduct throughout summation," counsel failed to request an instruction on justification, and counsel mishandled the issue of the internship (claims one, five, and seven). Dkt. 1 at 6, 13, 15. The Appellate Division addressed the ineffective assistance claims on the merits, under both state and federal law. 938 N.Y.S.2d at 607. The court held that, "viewing defense counsel's performance in totality, counsel provided meaningful representation." *Id.* (citing state cases). The court also concluded that "defendant was not deprived of the effective assistance of counsel under the Federal Constitution." *Id.* (citing *Strickland v. Washington*, 466 U.S. 668 (1984).

In general, to prevail on a claim of ineffective assistance under federal law, a petitioner must (1) show that counsel's performance was so deficient as to fall below "an objective standard of reasonableness"; and (2) establish prejudice by demonstrating

a "reasonable possibility" that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694.  In the context of a habeas petition pursuant to 28 U.S.C. § 2254, "[e]stablishing that a state court's application of *Strickland* was unreasonable . . . is all the more difficult.  The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Harrington*, 562 U.S. at 105 (citations omitted). Therefore, "[t]he operative question" when a federal court reviews "a state court's *Strickland* ruling is thus not whether [the] federal court believes the state court's determination was incorrect, but rather whether that determination was objectively unreasonable." *Waiters*, 857 F.3d at 478 (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)) (internal marks omitted).

   The standard to establish an ineffective assistance of counsel claim under New York law is lower than under federal law.  *See People v. Honghirun*, 78 N.E.3d 804, 807 (N.Y. 2017).  In New York, a defendant must show only "that counsel failed to provide meaningful representation." *People v. Alvarez*, 125 N.E.3d 117, 120 (N.Y. 2019) (citing *People v. Stultz*, 810 N.E.2d 883 (N.Y. 2004); *People v. Baldi*, 429 N.E.2d 400 (N.Y. 1981)).  Unlike the federal standard, *see Strickland*, 466 U.S. at 694, under the state standard, the defendant is not required to demonstrate that he was prejudiced by the ineffective assistance, *see Alvarez*, 125 N.E.3d at 120.

The Appellate Division's determinations that Hernandez's counsel provided "meaningful representation" under state law and that Hernandez failed to meet the *Strickland* standard are entitled to deference -- and they are not objectively unreasonable.

In his first claim, Hernandez contends in conclusory terms that his trial counsel "was ineffective in objecting to prosecutor's rampant misconduct throughout summation and failed to develop the record." Dkt. 1 at 6.  The only specificity he provides is in his reply papers, where he identifies one statement: in summation, the prosecutor referred to Hernandez's efforts to find a lawyer (by calling his brother) to arrange for a surrender date and bail package.  Dkt. 13 at 48 (citing page 393 of the trial transcript).  Hernandez contends this was an improper comment on his right to counsel. *Id*. at 48-50.  In fact, however, the prosecutor was responding to Hernandez's assertion that he was the victim and not the shooter.  The prosecutor argued that Hernandez's actions were inconsistent with his having been shot by a gunman:

> A victim calls the police and says this guy tried to kill me.  A victim does not arrange to call [his] brother and say get me a lawyer, I got to get a bail package, I have to surrender, I don't want to sit in jail awaiting [] trial, I want a bail package set for me and when that's set, then I will surrender.  That's not what a victim does.  In fact if he is trying to get a lawyer and trying to get a surrender date and a bail package waiting for him, isn't that consistent with what a person who is guilty does, not a victim?

Dkt. 9-2 at 393.

14

In his fifth claim, Hernandez argues that his trial counsel was ineffective for failing to request an instruction on the defense of justification.  Dkt. 1 at 13.  Under New York law, the use of deadly physical force is justified when a person reasonably believes that such force is necessary to defend himself from what he reasonably believes to be the use or imminent use of deadly physical force.  *See* N.Y. Penal Law § 35.15(1), (2).  But here, when he took the stand, Hernandez did not argue that he was justified in *shooting* Iccori but instead he *denied* shooting Iccori.  He testified that while the gun went off, it did not go in his hand, he never had the gun, and he never fired it.  Dkt. 9-2 at 255 ("Q. . . . [W]hen the gun went off, was it in your hand?  A.  No, no."), 259, 292, 294 ("I never had the gun."), 296 ("I don't know how he got shot."), 298 ("Q.  You never shot it [the gun] that day?  A.  No.").  In light of Hernandez's insistence that he did not shoot Iccori, it was reasonable for counsel not to request a justification instruction.

In his sixth and seventh claims, Hernandez contends that the prosecutor engaged in misconduct by cross-examining him about being fired from an internship and that defense counsel was ineffective for failing to object and for bringing up the subject himself on re-direct examination and in summation.  Dkt. 1 at 15.  When Hernandez took the stand at trial, his counsel brought out that Hernandez had graduated from the Borough of Manhattan Community College and continued his education at Pace University, where he majored in accounting, earned a Bachelor's Degree in Business Administration, and held leadership positions in the Association of

Latinos in Finance and Accounting.  Dkt. 9-2 at 246-47.  On cross-examination, the

prosecutor brought out that not everything went smoothly at Pace as he questioned

Hernandez about being fired from an accounting firm while in an internship program

sponsored by Pace; in responding to the questions, Hernandez was evasive, at first

denying that he had been fired but eventually admitting that the firm told him to "just

go home."  *Id*. at 282-87.  On re-direct, defense counsel tried to rehabilitate Hernandez

by getting him to acknowledge that he "did have a problem" at the accounting firm but

that nonetheless he was able to continue his studies and eventually get a degree.  *Id*. at

310-11.  And in summation, his counsel made a passing reference to the internship

incident, saying:

> Does [Mr. Hernandez] have the best background in the world?  No.
> Would I be happy if I was his parents?  He went to college, still ended up
> doing a stupid thing that resulted in a felony conviction [referring to a
> 1999 attempted robbery conviction, *id*. at 244-45], no, I wouldn't be happy
> about that.  Does it make him a marijuana dealer?  Does it make him a guy
> who took a gun and fired it point blank at another human being?  No.
> Would I be happy that my son while going to Pace University got fired
> from an internship and wasn't completely honest about it?  No.  Does it
> make him a marijuana dealer?  Does it make him someone who walked
> into someone's house and shot a man twice, at least twice?  No.

*Id*. at 372-73.  The arguments were a reasonable effort by counsel to minimize

Hernandez's evasiveness and less-than-forthrightness in his testimony.

        The Appellate Division's rejection of the ineffective assistance claims was

reasonable, as was its conclusion that the prosecutor's "challenged remarks were fair

comment on the evidence, permissible rhetorical comment, or responsive to defense counsel's summation, or did not warrant reversal." 938 N.Y.S.2d at 607.

In evaluating whether counsel has provided "meaningful representation," "counsel's efforts should not be second-guessed with the clarity of hindsight to determine how the defense might have been more effective." *People v. Benevento*, 697 N.E.2d 584, 587 (N.Y. 1998). Moreover, "[o]nce a defendant testifies and places his credibility in issue, a prosecutor need not tread lightly in cross-examining him or arguing his case to the jury." *People v. Overlee*, 666 N.Y.S.2d 572, 575(1st Dep't 1997). A prosecutor may, within reasonable limits imposed by the court, "cross-examine a defendant as forcefully as possible," and he "is similarly afforded wide latitude in his summation." *Id.* (cleaned up and citations omitted). Ultimately, the issue is whether "the prosecutor's conduct was so egregious as to have deprived defendant of a fair trial." *Id.* As the Court instructed in *Strickland*, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." 466 U.S. at 689.

Hernandez has failed to show that the Appellate Division's rejection of these claims was objectively unreasonable. He took the stand and placed his credibility in issue, and thus the prosecutor was free to vigorously challenge his credibility. The prosecutor's conduct was not egregious and did not deprive Hernandez of a fair trial, and defense counsel's conduct fell well within the wide range of professional assistance.

The ineffective assistance and prosecutorial misconduct claims do not provide a basis for federal habeas relief.

### B.    The Inaccuracies in the § 440 Decisions

In denying Hernandez's § 440 motion, the trial court made two errors: it used the wrong indictment number and it mistakenly stated that Hernandez shot Iccori "to death." Dkt. 9-1 at 140.  In denying his application for leave to appeal the denial of Hernandez's § 440 motion, the Appellate Division used the same wrong indictment number.  *Id*. at 139.  In his claims two and three, Hernandez contends that the errors deprived him of his rights under the First, Fifth, Sixth, and Fourteenth Amendments. Dkt. 1 at 8, 10.

It is true that the two state court decisions used the wrong indictment number and the § 440 trial court erroneously stated that Hernandez "was arrested for shooting Robert Iccori to death." Dkt. 9-1 at 140.  It is clear, however, that the errors had no bearing on the disposition of Hernandez's motion.  The trial court's decision otherwise accurately describes the case, referring to "an argument between the two men over the contents of a marihuana bag that the defendant had sold to the victim."  *Id*. The decision accurately notes that Hernandez was charged with *attempted* murder (as well as assault and criminal possession of a weapon) and that he was convicted of *attempted* murder and criminal possession of a weapon.  *Id*.  The decision accurately cited Hernandez's sentence of concurrent determinate terms of ten years' imprisonment

and five years' post-release supervision. *Id*.  Moreover, the trial court denied the motion

principally for procedural reasons, and while the state courts' errors were unfortunate,

they had no impact on the decisions to deny the motion and leave to appeal.

As the Second Circuit has held, "not 'every error of state law can be

transmogrified by artful augmentation into a constitutional violation.'"  *Ponnapula v.*

*Spitzer*, 297 F.3d 172, 182 (2d Cir. 2002) (quoting *Sanna v. Dipaolo*, 265 F.3d 1, 12 (1st Cir.

2001)); *see Johnson v. Rosemeyer*, 117 F.3d 104, 110 (3d Cir. 1997) ("[E]rrors of state law

cannot be repackaged as federal errors simply by citing the Due Process Clause").  The

mistakes in the two state court decisions provide no basis for federal habeas relief.

### C.    The 911 Call

In his fourth claim, Hernandez contends that the trial court violated his

right to confront witnesses by admitting into evidence the recording of a 911 call made

by a witness who reported hearing gunshots. Dkt. 1 at 12.  The witness stated that he

"just heard some shots, and it sounded like someone got shot or something."  Dkt. 9-1 at

113 (quoting Defendant's Brief at 23 (quoting from People's Exhibit 10)).  Overruling

defense counsel's objection that the call happened after Iccori's call to 911 and "so the

incident was therefore over," Dkt. 9-2 at 233, the trial court admitted the recording

under the present sense impression exception to the hearsay rule, *id*. at 233-37.  On

appeal, the Appellate Division affirmed, holding that the recording was "properly

admitted . . . under the present sense impression to the hearsay rule," reasoning that the

"time delay between the occurrence of the events and the call was not sufficient to destroy the indicia of reliability upon which this hearsay exception rests." 938 N.Y.S.2d at 607.

Purported evidentiary errors in a state court trial are rarely a basis for habeas relief. The Supreme Court has acknowledged its "traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts." *Crane v. Kentucky*, 476 U.S. 683, 689 (1986). As trial judges are "called upon to make dozens, sometimes hundreds, of decisions concerning the admissibility of evidence" in any given criminal trial, "the Constitution leaves to the judges who must make these decisions 'wide latitude'" in ruling on the admissibility of evidence. *Id*. at 689-90 (citation omitted). Consequently, "[e]rroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus. Rather, the writ would issue *only* where petitioner can show that the error deprived her of a *fundamentally fair* trial." *Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir. 1983) (citations omitted). The erroneous admission of evidence constitutes a denial of due process "only if the evidence in question 'was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.'" *Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir. 1992) (citation omitted).

Here, the trial court's decision to admit the 911 call and the Appellate Division's affirmance of that decision were eminently reasonable and are entitled to

deference.  The delay, if any, between the firing of the shots and the call was minimal, and the call still, as the Appellate Division concluded, carried indicia of reliability.  It was not likely that the neighbor was lying or mistaken about hearing what sounded like gunshots, and there was corroborating evidence in any event in the form of the shell casings and spent bullet.  There was no error here, much less constitutional error that would warrant federal habeas relief.

### D.    The Dismissal of the Juror

In his eighth claim, Hernandez contends that the trial court's dismissal of a juror violated his Sixth Amendment "right to a fair and impartial juror."  Dkt. 1 at 15.  Hernandez did raise this claim before Appellate Division, but Respondent argues that the claim is unexhausted because the claim was not couched in terms of federal law.  In rejecting the claim, the Appellate Division did not reference the Sixth Amendment and cited only state case law.

The claim, however, provides no basis for habeas relief, whether it is based on federal or state law.  The Appellate Division held that the trial court "did not improvidently exercise its discretion in disqualifying a sworn juror as grossly unqualified to serve on the jury, as he could not unequivocally state that he could reach a fair and impartial decision."  938 N.Y.S.2d at 606-07.  The Appellate Division's conclusion is entitled to deference, and the trial court's determination that the juror was not fit for further service was a factual finding entitled, on habeas review, to a

presumption of correctness. *See Marshall v. Lonberger*, 459 U.S. 422, 432 (1983) (state

court's factual determination is entitled to a "presumption of correctness" and may not

be set aside on habeas review unless it lacks "fair support in the record") (cleaned up);

*Hughes v. Phillips*, 457 F. Supp. 2d 343, 368 (S.D.N.Y. 2006) ("a trial court's finding that a

sworn juror was not fit for further service is a factual determination that is entitled to a

presumption of correctness unless unsupported by the record."); *Ocasio v. David*, No. 99

Civ. 10760 (JSM), 2001 WL 930847 (S.D.N.Y. Aug. 16, 2001) ("Clearly no constitutional

right of Petitioner was violated by the replacing of one juror with an alternate juror.").

Here, the trial court's determination that the juror was not fit for further

service was amply supported by the record and the Appellate Division's conclusion that

the trial court did not abuse its discretion in replacing the juror with an alternate was

reasonable.  The juror's brother-in-law apparently belonged to a professional

organization of which Hernandez was also a member (as was revealed during

Hernandez's testimony), and the juror believed that it was "very likely" that Hernandez

and his brother-in-law knew each other.  Dkt. 9-2 at 343.  When the court asked the

juror whether the relationship would affect his ability to be "fair and objective," the

juror responded "yes," and explained that "[t]he whole situation makes me

uncomfortable." *Id*. 344-45.  In these circumstances, it was not an abuse of discretion for

the court to excuse the juror. *See United States v. Mulder*, 273 F.3d 91, 108 (2d Cir. 2001)

("A court's decision as to whether 'just cause' exists to excuse a juror after jury deliberations have begun is subject to review for abuse of discretion.").

Whether this claim is premised on the Sixth Amendment or state law, it provides no basis for habeas relief.

## CONCLUSION

Hernandez has failed to show a basis for relief under 28 U.S.C. § 2254. Accordingly, his habeas petition is denied. Additionally, I decline to issue a certificate of appealability because Hernandez has not made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253. Pursuant to 28 U.S.C. § 1915(a)(3), I certify that any appeal taken from this decision and order would not be taken in good faith.

The Clerk of the Court shall enter judgment accordingly and close this case. The Clerk shall also mail copies of this memorandum decision and the judgment to Hernandez at his last known address.

SO ORDERED.

Dated:      New York, New York
            March 1, 2023

DENNY CHIN
United States Circuit Judge
Sitting By Designation

23